VON-LUSK, A CALIFORNIA LIMITED PARTNERSHIP, THE LUSK COMPANY, TAX MATTERS PARTNER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4271–93.          Filed February 2, 1995.

■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

Milton E. Bracken (an officer), for petitioner.
*Susan C. Hergenhan* and *Roy Wulf,* for respondent.

OPINION

RAUM, *Judge:* This case involves the Commissioner's determination that certain expenses deducted in Von-Lusk's returns for 1988, 1989, and 1990, were not deductible but instead were to be capitalized under section 263A.[1]

Von-Lusk (also referred to as the partnership) is a California limited partnership. Petitioner, the Lusk Co., is an S corporation and was the tax matters partner of Von-Lusk for 1988, 1989, and 1990. On the date the petition was filed in this case, the principal place of business for both the partnership and the Lusk Co. was in Irvine, California.

Von-Lusk filed a U.S. Partnership Return of Income (Form 1065) for each of the calendar years 1988, 1989, and 1990. On December 14, 1992, the Commissioner issued notices of final partnership administrative adjustment (FPAA) to Von-Lusk for those years in which deductions claimed on the returns for each of the years were disallowed as follows:

| Partnership item | 1988 | 1989 | 1990 |
|---|---|---|---|
| Interest expense | $190,761 | $352,150 | $457,659 |
| Taxes | 206,377 | 229,845 | 211,903 |
| Other deductions | 110,725 | 201,443 | 187,797 |

After the initial pleadings in this Court, the Commissioner filed an amendment to answer, in which the Commissioner conceded the foregoing interest expense deductions. The adjustments in the FPAA's for taxes and other deductions remain at issue. The explanation of adjustments in the FPAA's stated that "The deduction for taxes is not allowed because the partnership has not established that the amounts claimed were not capital in nature." It went on to state that "The deduction for other expenses is not allowed because the partnership has not substantiated that the

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

amounts claimed were ordinary and necessary expenses paid or incurred by the partnership during the taxable year in carrying on a trade or business or an activity engaged in for profit or that the amounts claimed were not capital in nature."

Von-Lusk was formed in 1966 with the stated purpose of managing, holding, and developing for investment approximately 278 acres of raw land (the property), which was contributed to the partnership by its partners in 1966. Prior to the transfer, the general and limited partners (collectively) each owned an undivided one-half interest in the property. The general partner (the Lusk Co.) and the limited partners collectively (various members of the Von der Ahe family) each own a 50-percent interest in the partnership.

The Lusk Co. is a residential and commercial real estate development company. The Lusk Co. is the general partner in more than 40 general and limited partnerships in California (the Lusk partnerships). The Lusk partnerships invest in and develop real estate; own and rent apartments, commercial buildings, and industrial buildings; and own and operate a livestock ranch and farm.

The Lusk Co., as general partner and managing partner of real estate development partnerships, engages the services of many contractors, lobbyists, various engineers, architects, and others to perform services for these partnerships. These independent contractors, on behalf of the Lusk partnerships, meet with government officials, obtain building permits and zoning variances, negotiate permit fees, perform engineering and feasibility studies, and draft architectural plans. The contractors bill the Lusk partnerships that benefit from their work for the cost of their services. During 1988, 1989, and 1990, Von-Lusk incurred independent contractor costs of $17,912, $62,611, and $88,848, respectively. Von-Lusk claimed these amounts on its returns for such years under the caption "other deductions" as consultants, advertising, insurance, market research, off-premise sales, and other costs.

Service Mortgage Co. is a California corporation and an affiliate of the Lusk Co. Service Mortgage Co. provides management services for the Lusk Co. and the Lusk partnerships. Service Mortgage Co. employs executives, project managers, secretaries, and accountants. These employees monitor

the Lusk partnership projects and review and direct the work of the contractors discussed above. Service Mortgage Co. bills the cost of their employees to the Lusk partnerships that benefit from the work.

When Service Mortgage Co. bills a Lusk partnership other than a partnership engaged in property management or rental activities, the amount is charged to a "work in progress" account for that particular partnership. Service Mortgage Co. includes a markup for overhead and facilities costs in the wages charged to "work in progress" accounts. The Lusk partnerships that own and operate rental property are charged for time spent by Service Mortgage Co.'s administrative personnel. These charges are deducted by the Lusk partnerships as period costs.

During 1988, 1989, and 1990, Service Mortgage Co. billed Von-Lusk in the amounts of $92,813, $138,822, and $98,949, respectively. These amounts include the wages, payroll taxes, and fringe benefits of Service Mortgage Co.'s administrative personnel and the overhead markup described above. The overhead markup represents approximately 40 percent of the total amount billed. The wages, payroll taxes, and fringe benefits of Service Mortgage Co.'s administrative personnel represent approximately 60 percent of the total amount billed. Accordingly, during 1988, 1989, and 1990, Service Mortgage Co. billed Von-Lusk approximately $37,125, $55,529, and $39,580, respectively, for overhead and $55,688, $83,293, and $59,369, respectively, for the wages, payroll taxes, and fringe benefits of Service Mortgage Co.'s administrative personnel. Von-Lusk deducted the amounts it paid to Service Mortgage Co. during the years 1988, 1989, and 1990, on its tax returns for those years under the caption "other deductions—wages and salaries".

The "other deductions" claimed on Von-Lusk's tax returns for the years 1988, 1989, and 1990, consist of the following costs:

| Other deductions | 1988 | 1989 | 1990 |
|---|---|---|---|
| Consultants | $13,563 | $49,750 | $74,644 |
| Advertising | 475 | 3,875 | - 0 - |
| Insurance | 711 | 905 | 916 |
| Wages and salaries | 92,813 | 138,822 | 98,949 |
| Market research | 500 | 1,625 | 6,934 |

| Other deductions | 1988 | 1989 | 1990 |
|---|---|---|---|
| Off-premise sales | 2,516 | 3,837 | 5,514 |
| Other costs | 147 | 2,619 | 840 |
| Total | 110,725 | 201,433 | 187,797 |

The deductions for "Advertising", "Market research", and "Off-premise sales" refer to costs incurred to advise Von-Lusk as to the appropriateness of product mix and pricing for the property. Von-Lusk did not engage in active sales efforts during 1988, 1989, and 1990. On its returns for the years 1988, 1989, and 1990, Von-Lusk deducted real property taxes incurred and paid in the amounts of $206,377, $229,845, and $211,303, respectively. Von-Lusk also deducted $600 in 1990 for a California franchise tax shown to be due on its California franchise tax return.

The property is located in San Bernardino County, California, in an area called Chino Hills. Chino Hills was incorporated on December 1, 1991. Prior to this date, development was controlled by the San Bernardino County Planning Commission and Board of Supervisors.

In August 1982, the San Bernardino County Board of Supervisors approved the Chino Hills Specific Plan, which provided for 2,779 dwelling units on the property. In 1985, Von-Lusk agreed to the inclusion of the property in Chino Hills Assessment District No. 85–1, which is a special assessment district that was formed to provide for the acquisition and construction of certain public improvements within the district. Without further elaboration or explanation the parties have stipulated that "This special assessment increased Von-Lusk's property taxes by over $200,000 per year."

In 1985, Von-Lusk submitted a preliminary development plan for the property to the San Bernardino County Board of Supervisors. In January 1986, the San Bernardino County Board of Supervisors approved the preliminary development plan for the property (also referred to as the Lusk Los Serranos property and/or Fairfield Ranch). The approved Lusk Los Serranos Preliminary Development Plan provided for 1,444 dwelling units on the property. The Chino Hills Specific Plan (referred to above) had provided for 2,779 dwelling units on the property.

The San Bernardino County Board of Supervisors set a development fee of $31,680,600 for the property. The county did not reduce the development fee when it approved the preliminary development plan. The preliminary development plan allowed 1,335 fewer units than the Chino Hills Specific Plan. On a per-unit basis, this increased the development fee from $11,400 per unit to $21,940 per unit. During 1988, 1989, and 1990, Von-Lusk pursued an appeal in an attempt to reduce the development fee.

In January 1986, the San Bernardino County Board of Supervisors informed Von-Lusk that it would not approve a final development plan and tract map for the property unless certain conditions were met. In 1987, in response to an application filed by Von-Lusk, the property was removed from the agricultural preserve and zoned for residential development. The rezoning was done in accordance with the Chino Hills specific plan and constituted a rezoning of the property for future use. The property was used by tenant farmers to raise grass and grains during the years 1988, 1989, and 1990.

On September 22, 1988, Von-Lusk submitted tentative tract maps to the San Bernardino County Board of Supervisors. On May 18, 1989, the county approved the tentative tract maps, subject to certain conditions. Condition No. 70 provides:

no map shall be recorded for any phase of this tract until all necessary contracts have been approved and executed for the construction of Soquel Canyon Parkway from El Prado Road/Central Avenue to its planned connection with lower Carbon Canyon Road or an alternative highway in Orange County and no building permits shall be issued until 90 days prior to the projected completion of the parkway.

During 1988, 1989, and 1990, no agreement was reached between San Bernardino County and Orange County as to the location of the Soquel Canyon Parkway connection, no funding issues for the highway were approved, and no physical activities were commenced in connection with the construction of the highway.

Condition No. 125 also imposed by the San Bernardino County Board of Supervisors as a condition for approval of the tentative tract map required Von-Lusk to design, construct, and finance a six-lane addition to Soquel Canyon

Parkway from the Corona Expressway interchange east to Chino Creek, a six-lane bridge at Chino Creek, a six-lane section of Soquel Canyon Parkway from the Chino Creek Bridge east to the El Prado Road/Central Avenue intersection, and a one-half width section of Central Avenue from the Corona Expressway east to the Chino Creek.

Von-Lusk appealed condition No. 70 and several other conditions. This appeal was pending during the years 1988, 1989, and 1990. During those years Von-Lusk could not obtain building permits for the property because condition No. 70 had not been met. During the years 1988, 1989, and 1990, Von-Lusk did not make any physical improvements to the property, and the property continued to be used by tenant farmers to raise grass and grains.

The parties stipulated that on August 6, 1993, sections 1.263A–1 through 1.263A–6, Income Tax Regs., were adopted, and that these regulations apply to costs incurred in taxable years beginning after December 31, 1993. Accordingly, the parties agreed that neither party would argue that the facts contained in the stipulation of facts cause section 1.263A–2(a)(3)(ii), Income Tax Regs., to apply to the property.

No controversy is before us as to whether Von-Lusk was engaged in an activity for profit, or whether the expenditures at issue were properly made in pursuit of a business profit. Both parties have limited their argument to, and our opinion deals exclusively with, whether the expenditures at issue should have been capitalized under section 263A or were properly deducted, as claimed by petitioner.

The general rule of section 263A is found in section 263A(a), which states:

SEC. 263A(a). NONDEDUCTIBILITY OF CERTAIN DIRECT AND INDIRECT COSTS.—

(1) IN GENERAL.—In the case of any property to which this section applies, any costs described in paragraph (2)—

(A) in the case of property which is inventory in the hands of the taxpayer, shall be included in inventory costs, and

(B) in the case of any other property, shall be capitalized.

(2) ALLOCABLE COSTS.—The costs described in this paragraph with respect to any property are—

(A) the direct costs of such property, and

(B) such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property.

> Any cost which (but for this subsection) could not be taken into account in computing taxable income for any taxable year shall not be treated as a cost described in this paragraph.

Subsection (b) describes the property to which section 263A applies. Briefly stated, section 263A applies to (1) property produced by the taxpayer and (2) property acquired for resale. The parties agree that the property at issue was not acquired by Von-Lusk for resale, as contemplated by the statute. Therefore, for section 263A to be applicable, the property must be "produced by the taxpayer."

Section 263A(g)(1) states that "The term 'produce' includes construct, build, install, manufacture, develop, or improve." The term "produce" is given further explanation in section 1.263A–1T(a)(5)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 10061 (Mar. 30, 1987), which states that "For purposes of this section, the term 'produce' includes construct, build, install, manufacture, develop, improve, create, raise or grow."

If Von-Lusk's activities fall within the description "construct, build, install, manufacture, develop, improve, create, raise or grow", then Von-Lusk "produced" the property. If Von-Lusk "produced" the property, then section 263A applies. If section 263A applies, then the direct and a proper share of the indirect costs of the property are to be capitalized.

Section 263A is a relatively new addition to the Internal Revenue Code, having been added by section 803 of the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085, 2350. The statute itself does not provide a comprehensive definition of "produce". Rather, it merely lists a series of examples of activities which are included in the term "produce". Sec. 263A(g)(1). The Commissioner's regulations quoted above follow this path, choosing merely to add to the statutory list of examples rather than setting forth a comprehensive definition.

It falls on us then to determine whether Von-Lusk's activities come within the word "produce" as used by Congress in section 263A. To the extent that the legislative history accompanying section 263A furnishes some guide as to what activities Congress meant to include within the term "produce", it may be found in the reasons behind the development of section 263A. As the Senate Finance Committee stated:

The committee believes that the present-law rules regarding the capitalization of costs incurred in producing property are deficient in two respects. First, the existing rules may allow costs that are in reality costs of *producing,* acquiring, or *carrying* property to be deducted currently, rather than capitalized into the basis of the property and recovered when the property is sold or as it is used by the taxpayer. This produces a mismatching of expenses and the related income and an unwarranted deferral of taxes. Second, different capitalization rules may apply under present law depending on the nature of the property and its intended use. These differences may create distortions in the allocation of economic resources and the manner in which certain economic activity is organized.

The committee believes that, in order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property, including interest expense, subject to appropriate exceptions where application of the rules might be unduly burdensome.

[S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 140; emphasis added.]

For virtually identical language, see H. Rept. 99–426 (1985), 1986–3 C.B. (Vol. 2) 625; Staff of the Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 508–509 (J. Comm. Print 1987).

Two purposes behind the enactment of section 263A can be gathered from this legislative history. First, Congress expected that a single set of comprehensive rules would be applied to determine whether to capitalize costs. Second, Congress expected those rules to be applied from the acquisition of property, through the time of production, until the time of disposition. To give full effect to this congressional purpose a broad definition of "produce" is necessary.

We must determine whether the activities engaged in by Von-Lusk properly fit within a broad definition of "produce". Von-Lusk deducted as "other expenses", under the headings consultants, advertising, insurance, market research, off-premise sales, and other costs, amounts paid for the services of independent contractors. The functions performed by these independent contractors included meeting with government officials, obtaining building permits and zoning variances, negotiating permit fees, performing engineering and feasibility studies, and drafting architectural plans. Von-Lusk deducted under "other deductions—wages & salaries" amounts paid to Service Mortgage Co. The amounts paid Service Mortgage Co. represented compensation for services provided by Service Mortgage Co. in reviewing and directing the work of the contractors discussed above.

While the pursuit of building permits and zoning variances, negotiating permit fees, and similar activities may not readily spring to mind as examples of production activity, we think that upon reflection they are properly classifiable as such. Such activities are ancillary to actual physical work on the land and are as much a part of a development project as digging a foundation or completing a structure's frame. The project cannot move forward if these steps are not taken.

Von-Lusk took purposeful steps to begin the development of the property. Petitioner attempts to place weight on the fact that Von-Lusk was formed with the stated purpose of managing, holding, and developing the property for investment. Petitioner claims Von-Lusk's activities never went beyond managing and holding. The stipulated facts indicate otherwise. Meeting with government officials, obtaining building permits and zoning variances, negotiating permit fees, performing engineering and feasibility studies, drafting architectural plans, and appealing development conditions go beyond managing and holding. *These activities represent the first steps of development.*

Having determined that Von-Lusk's activities represented the first steps in the development of the property, it then follows that Von-Lusk produced the property, as contemplated by Congress. As such, section 263A applies to the property, and Von-Lusk must capitalize the direct and a proper share of the indirect costs of the property.

We note that petitioner made no argument as to whether the costs at issue represented direct or indirect costs of the property. Petitioner contended only that section 263A does not apply to the property. Although we may treat this issue as conceded, see Rule 142(a), we consider it briefly below.

Section 263A(a)(2) states that the costs described in this paragraph with respect to any property are (A) the direct costs of such property, and (B) such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property. Section 1.263A–1T(b)(2)(i), Temporary Income Tax Regs., 52 Fed. Reg. 10061–10062, states: "Direct material costs and direct labor costs must be capitalized with respect to a production or resale activity * * * 'Direct labor costs' include the cost of labor that can be identified or associated with a particular activity." The costs deducted under "other deductions" pertained to the cost of

various professionals. As such they represent the cost of labor which can be identified or associated with a particular activity.

The fact that the services of these professionals were arranged by the Lusk Co. or performed by Service Mortgage Co. does not take them out from under section 263A. While they may, therefore, become indirect costs, they remain "costs that directly benefit or are incurred by reason of the performance of a production or resale activity". Sec. 1.263A–1T(b)(2)(ii), Temporary Income Tax Regs. They still must be capitalized. While only the "proper share" of the indirect costs is to be capitalized, petitioner offered no proof or argument that any of these costs did not relate to the activities that we have determined to be part of the development of the property.

The property taxes paid by Von-Lusk must also be capitalized. Taxes otherwise allowable as a deduction are specifically listed as an example of indirect costs. Sec. 263A(a)(2)(B); sec. 1.263A–1T(b)(2)(iii)(I), Temporary Income Tax Regs., 52 Fed. Reg. 10062 (Mar. 30, 1987).

Petitioner states in its brief: "With respect to the terms used to define 'produce' it would seem to be a logical conclusion that the physical appearance of raw land would be altered to some degree." Petitioner attempts to use the fact that no physical change occurred on the property to argue that there was no production. However, section 263A contains no requirement that there be a physical change. To read such a requirement into the statute would, in our judgment, subvert the purpose of Congress in enacting a broad set of uniform rules. In our opinion, Congress meant to include in the costs to be capitalized the preliminary, nonphysical steps of development at issue here.

Petitioner's argument is similar to one rejected by this Court in *Louisiana Land & Exploration Co. v. Commissioner*, 7 T.C. 507 (1946), affd. 161 F.2d 842 (5th Cir. 1947). There the taxpayer attempted to deduct amounts expended for a geophysical survey of property under lease to the taxpayer. The Commissioner argued that those amounts should be capitalized under section 24(a)(2) of the Internal Revenue Code of 1939 (the forerunner of section 263). Section 24(a)(2) prohibited the deduction of amounts paid for permanent

improvements or betterments made to increase the value of any property or estate.

The taxpayer argued: "the geophysical survey was not an improvement or betterment of its property, because it added nothing tangible thereto, and that it did not and could not increase the value of the property". *Louisiana Land & Exploration Co. v. Commissioner, supra* at 514. The Court rejected this argument. In language especially pertinent to the present case, the Court stated:

Under these circumstances it seems abundantly clear that the survey was the first step in the over-all development for oil of these tracts of land and that the benefit derived from the expenditure was to be enjoyed by petitioner in its business during the entire useful life of the asset being developed. * * * It is well settled that development expenses such as the platting, mapping, and subdividing of a tract of land held for sale must be capitalized and treated as an adjustment of the taxpayer's basis for such property. * * *, and we are unable to perceive any significant difference between such expenses and the one involved here. [*Id.* at 516; citations omitted.]

The Court rejected a requirement of physical change for capitalization. The result there reached is even more strongly called for in the present case. In *Louisiana Land & Exploration Co.*, the Court dealt with the precursor of section 263, whereas here the controlling provisions are in section 263A. And the legislative history of section 263A discloses that Congress was concerned with broadening, not narrowing, the scope of section 263 so as to avoid a "mismatching of expenses and the related income", and sought to provide for a more accurate reflection of income. See *supra* p. 215.

Petitioner next argues that the property could not be "produced" until the "production period" began. The "production period" is defined in section 263A(f)(4)(B) as beginning on the date on which production of the property begins, and ending on the date on which the property is ready to be placed in service or is ready to be held for sale. Petitioner relies upon the following explanation of the term "production period" in I.R.S. Notice 88–99, 1988–2 C.B. 422.

For purposes of the interest capitalization rules, the production period of real property generally begins when physical activity is first performed upon the property (e.g., the grading or clearing of land, the excavation of foundations or lines for utilities, the performance of mechanical activities such as plumbing or electrical work upon a building that is being rehabili-

tated or improved, or any other work relating to the construction or improvement of real property). * * *

Petitioner argues that since no physical activity was performed on the property, the production period did not begin for purposes of the interest capitalization rules, and that it therefore did not "produce" the property.

While petitioner's argument does have a superficial appeal, it does not survive close scrutiny. Subsection (f) of section 263A provides special rules for the *allocation of interest* to property produced by the taxpayer. It has no effect on the costs here at issue. Indeed, the narrow scope of subsection (f) is reflected in the Commissioner's concession as to the deductibility of the interest items for each of the 3 years at issue. To read the requirements of subsection (f) as applying to all costs would change the special rule to a general rule. Put differently, if no costs were to be capitalized until the beginning of the "production period", then section 263A(f)(1)(A) would be superfluous. Such a construction "offends the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633 (1973); see also *Phillips Petroleum Co. v. Commissioner,* 101 T.C. 78, 97 (1993) (all parts of a statute must be read together, and each part should be given its full effect).

Petitioner next argues for a consistency requirement between section 263A and section 312(n)(1). Section 312(n)(1) requires an adjustment to the earnings and profits account for construction period carrying charges. It imposes a capitalization requirement for interest, property taxes, and similar carrying charges incurred during the construction period. The term "construction period" is given the same meaning as the term "production period" under section 263A(f)(4)(B). Sec. 312(n)(1)(C).

Because the costs at issue were not incurred during the section 263A(f)(4)(B) production period, they were not incurred during the "construction period" and are, therefore, not required to be capitalized under section 312(n)(1). Petitioner argues that, in the interest of consistency, we should not require capitalization under section 263A. We disagree.

Section 312(n)(1) applies to costs that are otherwise deductible. Section 312(n)(1)(B) includes construction period

carrying charges "to the extent such interest, taxes, or charges are attributable to the construction period for such property and would be allowable as a deduction in determining taxable income under this chapter for the taxable year in which paid or incurred." If costs must be capitalized under other provisions of the Internal Revenue Code, then section 312(n)(1) is not applicable. Earnings and profits will be accurately reflected through the taxpayer's decreased deductions and increased income.

The final argument made by petitioner is that some of these costs are specifically excluded from capitalization under section 1.263A–1T(b)(2)(v)(A), Temporary Income Tax Regs., 52 Fed. Reg. 10063. The costs excluded by that regulation are marketing, selling, advertising, and distribution expenses. Petitioner uses this regulation to argue that the advertising, market research, and off premise sales expenses are not capital expenditures.

Petitioner stipulated that those expenditures "refer to costs incurred to advise Von-Lusk as to the appropriateness of product mix and pricing for the Property. Von-Lusk did not engage in active sales efforts during 1988, 1989 and 1990." As such, these expenses are not of the type contemplated by the above-cited regulation. The label applied by petitioner is irrelevant.

We are aware that conditions imposed on Von-Lusk by local government authorities made the delay of this project unavoidable and the continued pursuit of the project so financially unattractive as to possibly preclude going forward with it. That does not change our view that steps were taken to begin the development of the property. The result of those steps is that Von-Lusk came under the rule of section 263A.[2]

In the light of our conclusion above that the deductions in controversy must be capitalized, it is unnecessary to consider the Commissioner's alternative argument that the "other expenses", if not required to be capitalized by section 263A, should be capitalized under section 263.

---

[2] We are aware of the opinion in *Hustead v. Commissioner*, T.C. Memo. 1994–374, which contains some dicta as to the scope of the term "produce" in respect of certain expenditures for activities that were less extensive than and were quite unlike the expenditures involved herein. The case also considered whether the property was held by the taxpayer primarily for sale to customers in the ordinary course of trade or business so as to bring sec. 263A(b)(2) into play in the circumstances there before the Court. The Court ultimately bypassed the applicability of sec. 263A, and held the expenditures nondeductible by reason of sec. 263.

Since respondent has conceded the interest deductions originally at issue,

*Decision will be entered under Rule 155.*